**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **Trilliant Health, Inc.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:20-cv-172** |
| | ) | |
| **Jeff McDonald, and Kythera Labs,** | ) | **Judge Trauger** |
| **Inc.,** | ) | **Magistrate Judge Holmes** |
| | ) | |
| **Defendants.** | ) | |

**RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR**
**PRELIMINARY INJUNCTION**

## I.    INTRODUCTION

The depositions have been taken, and the results are in. If Plaintiff Trilliant

Health, Inc. ("Trilliant") ever had a basis for seeking a preliminary injunction against

the Defendants, it no longer has one now.

Trilliant sought and obtained the right to take expedited depositions of Emilio

Ruocco of non-party Healthgrades Operating Co. ("Healthgrades") and defendant Jeff

McDonald, based on something Trilliant's CEO, Hal Andrews, says he heard from

someone trying to get a job at Trilliant. This job-seeker used to work at Emilio Ruocco's

employer, Evariant, Inc. ("Evariant"), which has since been acquired by Healthgrades.

(Declaration of Hal Andrews ("Andrews Decl.") ¶¶ 12-13.) Mr. Andrews says that this

job-seeker told him an unnamed ex-Trilliant employee gave an "Emilio" at Evariant "a

file containing software … to build surgical episodes from anesthesia claims and durable

medical equipment claims." (*Id.* ¶ 12.) Mr. Andrews then leapt to two conclusions. The

ex-Trilliant employee had to be Mr. McDonald. (*See id.* ¶ 13.) And the software that

"Emilio" received had to have been Trilliant's. (*See id.*) On the basis of these

suppositions, Trilliant moved the Court to preliminarily enjoin the Defendants from using or disclosing an undefined "Trade Secret," which is described only as "certain proprietary software algorithms that create clinical care episodes from healthcare claims data." (Doc. 7, at 1.)

Mr. Ruocco and Mr. McDonald have now both been deposed. They not only haven't exchanged any "software," as alleged by the job-seeker, but they have not even discussed "source code." (*See* Declaration of Richard G. Sanders ("Sanders Decl.") & Ex. A; Declaration of Jeff McDonald ("McDonald Decl.") ¶ 26.) Further, none of the work that Kythera Labs has provided for Evariant/Healthgrades was related to building "clinical care episodes from healthcare claims data." (McDonald Decl. ¶¶ 13-18.) This should be the end of Trilliant's Motion for Preliminary Injunction, if not the entire case.

For this reason alone, Trilliant's Motion for Preliminary should be denied. The motion has several other flaws, some of which are just as fatal:

- Trilliant fails to identify the "Trade Secret" whose disclosure it seeks to enjoin. This failure is absolutely fatal to Trilliant's motion.

- Because there is no presumption of irreparable harm, Trilliant has also failed to show any irreparable harm. This failure is also fatal to the motion.

- If a broadly worded injunction were issued against Kythera Labs, Kythera Labs would have to cease operations.

- The healthcare data analytics work performed by Kythera Labs benefits the public.

## II.    FACTUAL BACKGROUND

### A.  Spencer Kelly

Spencer Kelly is not a party to this lawsuit, but he is (perhaps unwittingly) its catalyst. Mr. Kelly used to work for Evariant, a healthcare data analytics company, for which Kythera Labs was performing consulting work. (*See* Andrews Decl. ¶ 12.) In December 2019, Evariant was about to be acquired by Healthgrades, and Mr. Kelly was let go. (*See id*.) He began to look for work, and in January 2020, he was being interviewed by Trilliant, which is, of course, also a healthcare data analytics company. (*See id*.) In the course of the interview, Mr. Kelly for some reason told the interviewer that an unnamed former Trilliant employee had provided an Evariant employee named "Emilio" with a "file containing software that would enable Evariant to build surgical episodes from anesthesia claims and durable medical equipment claims." (*See id*.) When news of this reached Trilliant's CEO, Hal Andrews, Mr. Andrews felt he had to find out more and spoke with Mr. Kelly directly. (*See id*. ¶ 13.) During that second interview, Mr. Kelly told Mr. Andrews that Defendant McDonald had at some point "told Evariant how to solve for missinginess in the data." (*See id*.)

Other than what Mr. Andrews has chosen to report in his declaration, nothing else is known about what Mr. Kelly told him. Mr. Andrews either did not find out, or did not report, how Mr. Kelly knew any of this. Was Mr. Kelly's knowledge direct, or was he just reporting internal Evariant rumors? Did Mr. Kelly even know enough about the technology to talk intelligently about it? How did Mr. Andrews interview Mr. Kelly? Did he prod him with leading questions in order to obtain desired answers? None of this is

known. Mr. Kelly apparently lives in Utah.[1] He has not been deposed and is unlikely to be deposed any time soon. Trilliant describes Mr. Kelly as a "reliable source" (Doc. No. 7, at 2), but it presents no evidence to back up that description.

In any event, nothing that Mr. Kelly told Mr. Andrews was accurate.

### B. Healthcare Data Analytics

This case involves the healthcare data analytics industry. Data analytics is the science of turning raw data into useful information. (*See* McDonald Decl. ¶ 5.) In the context of healthcare, the data often consists of healthcare claims. But healthcare claims do not, by themselves, tell the whole story, or even very much of it, about the patients, their medical conditions or their experience in the healthcare system. (*See id.* ¶ 6.) For example, a hip-replacement operation would general multiple claims: for the anesthesia, the surgeons, the medical equipment, and so forth. (*See id.* ¶ 22.) Claims thus come from many different sources, and their data might overlap, contradict, be inconsistent, or just be missing. But data analytics can make sense of it. (*See id.*)

Central to Trilliant's Motion for Preliminary Injunction is the concept of an "episode of care" or "clinical care episode" (as Mr. Andrews refers to it). Whatever the "Trade Secret" is, it allegedly creates or "builds" episodes of care from healthcare claims data. (Doc. No. 7.) To return to the example of the hip-replacement operation, from the patient's point of view, the operation was a single event. But from the point of view of the claims, this seemingly single event is actually a bundle of events: surgery, anesthesia, use of medical equipment, and so forth, each of which might have its own claim. This bundle of related events is known as an "episode of care." (*See* McDonald

---

[1] Per this LinkedIn entry for a Spencer Kelly who lists Evariant as a former employer: https://www.linkedin.com/in/spencer-kelley-44423214/.

Decl. ¶ 22.) Using claims data to create episodes of care is a common activity of healthcare data analytics companies. (*See id.*)

### C. Jeff McDonald and Kythera and Their Work for Evariant

Jeff McDonald actually used to work for Evariant, a leading healthcare data analytics company, leaving in 2013. (McDonald Decl. ¶ 8.) In 2014, he helped found a new healthcare data analytics company called Expression Health Analytics. (*Id.*) In 2017, Trilliant acquired Expression Health Analytics, and Mr. McDonald stayed with Trilliant. (*Id.* ¶ 9) He was forced out of Trilliant, his employment being terminated on or around June 20, 2018. (*Id.* ¶ 10.) As part of his severance, Mr. McDonald agreed to a one-year non-compete. (*Id.*)

After waiting out the one-year non-compete, Mr. McDonald helped found defendant Kythera Labs. (*Id.* ¶ 11.) Kythera Labs' purpose is "to bring clarity and transparency about what's happening at the provider-patient level to pharmaceutical companies, payors, providers, researchers, and other members and observers of the healthcare industry." (*Id.* ¶ 7.)

One of its clients was Evariant, which has since been acquired by Healthgrades. (*See id.* ¶ 13.) Other than general advice about data sources and sales support, Kythera Labs has carried out two discrete projects for Evariant/Healthgrades. (*See id.* ¶¶ 13-17.) The first, which started in October 2019, was building healthcare practitioner and healthcare organization directories using healthcare data. (*See id.* ¶ 14.) (It may come as a surprise that there is no authoritative "practitioner yellow pages," and that such directories need to be built. (*See id.*)) This project had nothing to do with building episodes of care. (*Id.*) The second project, which started in February 2020, focused on a single St. Louis healthcare provider and related to payor reimbursement benchmarks

and patient origin datasets. (*See id*. ¶ 15) This project, too, had nothing to do with building episodes of care from claims data. (*Id*.)

In connection with the first project, Kythera Labs wrote some discrete source code. (*See id*. ¶ 16.) However, this source code was written specifically for the project. (*See id*.) This source code had nothing to do with "build[ing] surgical episodes from anesthesia claims and durable medical equipment claims," as apparently reported by Mr. Kelly. (*See id*. ¶¶ 14, 16.)

### D. Mr. McDonald's Relationship with Emilio Ruocco

Emilio Ruocco is employed by Evariant/Healthgrades. Mr. McDonald has known him since 2014 or 2015. (*See id*. ¶¶ 23-25.) Over those years, Mr. McDonald and Mr. Ruocco have, in a variety of contexts, discussed healthcare data analytics at a high level. (*See id*. ¶ 26.) Much of this pre-dates Trilliant's acquisition of Expression Healthcare Analytics. (*See id*. ¶¶ 23-25.) Needless to say, Mr. McDonald has never given Mr. Ruocco any software files, and Mr. Ruocco has not received any software files from Kythera Labs. (*See id*. ¶¶ 26-27; Sanders Decl. Ex. A.)

### III. ARGUMENT: THE MOTION FOR PRELIMINARY INJUNCTION SHOULD BE DENIED.

The preliminary injunction is an "extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). Courts balance four factors in deciding whether to issue the extraordinary equitable remedy of a preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harm

to others; and (4) whether the public interest would be served by issuance of the injunction." *City of Pontiac Ret. Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (internal quotes omitted). "A finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).

The burden of establishing entitlement to a preliminary injunction rests with the movant. *See Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Id.* This proof "is much more stringent than the proof required to survive a summary judgment motion." *Leary*, 228 F.3d at 739.

## A. Factor 1: Trilliant's Claims Are Unlikely to Succeed.

Under controlling Sixth Circuit authority, the plaintiff's "initial burden" in demonstrating entitlement to preliminary injunctive relief is a showing of a strong or substantial likelihood of success on the merits of his action. *See NAACP v. City of Mansfield*, 866 F.2d 162, 167 (6th Cir. 1989).[2]

---

[2] Trilliant suggests that the correct standard of proof is "prima facie," as though it need only survive a motion to dismiss. This is based on a misunderstanding of *White Consolidated Industries, Inc. v. Whirlpool Corp.*, 781 F.2d 1224 (6th Cir. 1986), a decision that has never been cited for this proposition, and for good reason. That was an antitrust case, in which the plaintiff sought to block defendant's acquisition of a competitor. Applying the "rule of reason," the district court found that the proposed transaction was "prima facie illegal" and granted a preliminary injunction blocking it. *See White Consol. Indus., Inc. v. Whirlpool Corp.*, 612 F. Supp. 1009, 1032 (N.D. Ohio 1985). Under antitrust law, when the "rule of reason" is applied, a burden-shifting framework is applied, whereby the plaintiff need only make a prima facie case, and the burden shifts to the defendant to rebut the prima facie case. *See, e.g., Food Lion, LLC v. Dean Foods Co. (In re Se. Milk Antitrust Litig.)*, 739 F.3d 262, 271-72 (6th Cir. 2014). In the anti-trust context, the plaintiff's ultimate burden was merely a prima facie case, and so its burden at the preliminary injunction stage would be the same. In any event, the district court vacated the preliminary injunction when the defendant took certain curative measures. It was *that* decision, not the decision to grant the preliminary injunction in the first place, that was appealed and, ultimately, affirmed.

Although Trilliant has brought three claims, they collapse into the same claim, at least for purposes of Trilliant's Motion for Preliminary Injunction. Both the Defend Trade Secrets Act (DTSA) and the Tennessee Uniform Trade Secrets Act (TUTSA) define "trade secret" and "misappropriation" the same way. *Compare* 18 U.S.C. § 1839(3) & (5) *with* T.C.A. 47-25-1702(4) & (2). As for the contract claim (applicable only to Defendant McDonald), "the terms 'trade secret' and 'confidential information' as used in Tennessee case law are synonymous for all practical purposes, and confidential business information is only protectible to the extent that it qualifies as a trade secret." *Hickory Specialties, Inc. v. Forest Flavors Int'l, Inc.*, 26 F. Supp. 2d 1029 (M.D. Tenn. 1998) (citing *Heyer-Jordan & Assoc., Inc. v. Jordan*, 801 S.W.2d 814, 815 (Tenn. Ct. App. 1990) and *Venture Express, Inc. v. Zilly*, 973 S.W.2d 602, 604 (Tenn. Ct. App. 1998)).

### 1. Trilliant has failed to identify its "Trade Secret."

Trilliant's failure to identify the "Trade Secret" is seeks to enjoin is a fatal and fundamental flaw that infects its entire motion for preliminary injunction. If the Court does not know what the "Trade Secret" is, it cannot know what to enjoin. If the Defendants do not know what the "Trade Secret" is, it cannot assess and argue how it and the general public will be harmed.

"The identification of a 'trade secret' is a necessary predicate to alleging and proving that a trade secret was misappropriated." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 22 F. Supp. 3d 1305, 1314 (N.D. Ga. 2014) (citing *Capital Asset Research Corp. v. Finnegan*, 160 F.3d 683, 685-86 (11th Cir. 1998)). "It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets." *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) (citation

omitted). "Simply to assert a trade secret resides in some combination of otherwise known data is not sufficient, as the combination itself must be delineated with some particularity in establishing its trade secret status." *SL Montevideo Tech. v. Eaton Aerospace, LLC*, 491 F.3d 350, 354 (8th Cir. 2007) (internal quotation marks omitted). Thus, "[t]he burden is upon the plaintiff to specify those charges, not upon the defendant to guess at what they are." *Id.* (quoting *Xerox Corp. v. Int'l Business Machines Corp.*, 64 F.R.D. 367, 371 (S.D.N.Y. 1974)). "The plaintiff should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons … skilled in the trade." *Imax Corp. v. Cinema Technologies, Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998).[3]

As Judge Posner put it, "One expects a trade secret to be rich in detail, because a process described in general terms … will usually be widely known and thus not worth incurring costs to try to conceal and so not a trade secret." *Bondpro Corp. v. Siemens Power Generation, Inc.*, 463 F.3d 702, 710 (7th Cir. 2006) (Posner, J.).

Here, Trilliant has deliberately failed to identify the "Trade Secret" it wants enjoined. In its motion, Trilliant defines the "Trade Secret" as "*certain* proprietary software algorithms that create clinical care episodes from healthcare claims data and related software algorithms." (Doc. No. 7, at 1.) (Emphasis added.) This is precisely the kind of "broad area[] of technology" that fails to delineate a trade secret. The "Trade

---

[3] Although none of these decisions specifically applied the *Tennessee* Uniform Trade Secrets Act (TUTSA), they applied other states' enactments of that uniform law. These decisions are highly relevant and persuasive authority because TUTSA, by its own terms, is to be "applied and construed to effectuate its general purpose to make consistent the law with respect to the subject of this act among states enacting it." T.C.A. § 47-25-1709.

Secret" allegedly consists of *some* "proprietary algorithms," but Trilliant pointedly refuses to say which ones.

Further, enjoining **all** software algorithms that create clinical care episodes from healthcare claims data would be massively overbroad. Building episodes of care from healthcare claims is something that many, if not all, healthcare data analytics companies do. (*See* McDonald Decl. ¶ 22.)

### 2. Trilliant has failed to prove misappropriation.

An essential element of a claim for misappropriation of trade secrets is *misappropriation*. Both the TUSTA and the DTSA recognize three general categories of misappropriation: acquisition by improper means, use and disclosure. *See* 18 U.S.C. § 1839(5); T.C.A. § 47-25-1702(2). There is no accusation of acquisition or use, only of disclosure. Specifically, Trilliant contends, based a "reliable source," that defendant McDonald gave Emilio Ruocco of Evariant "Trilliant's proprietary software." (Doc. No. 7, at 2.)

As explained in Part I, *supra*, none of this is true. Kythera Labs and Mr. McDonald consult for Evariant, but there's nothing illegal about that. Mr. McDonald gave no "software" to Mr. Ruocco or anyone else at Evariant. (*See* McDonald Decl. ¶¶ 26-27.) To the extent Kythera Labs wrote any software for an Evariant project, it was software created by Kythera Labs independently for the specific consulting projects. (*See id.* ¶ 16.)

### 3. Spencer Kelly's information is too unreliable to be considered.

The only evidence to support Trilliant's theory of misappropriation is information supplied by Spencer Kelly to Hal Andrews. This information is not just hearsay; it is double hearsay. Not only is Mr. Andrews reporting what Mr. Kelly told him, but it is

unknown where *Mr. Kelly* obtained his information from. Unless Mr. Kelly somehow had personal knowledge of what he told Mr. Andrews, he had to have received the information from some unknown person or source. It is unknown how reliable that person or source was, how well Mr. Kelly understood the information, or how accurately he explained it to Mr. Andrews. It is also unknown what else he told Mr. Andrews, how well Mr. Andrews understood what Mr. Kelly was telling him, or how accurately and completely Mr. Andrews is reporting this conversation.

Evidentiary standards can be relaxed in the context of a motion for preliminary injunction, provided the evidence is appropriate given the character and objectives of the proceeding. But double hearsay, and especially anonymous double hearsay, is a bridge too far. *See AmMed Direct, LLC v. Liberty Med. Supply, Inc.*, No. 3:09-00288, 2009 U.S. Dist. LEXIS 87518, at *22-23 (M.D. Tenn. Sep. 23, 2009) (refusing to consider double hearsay); *Advance Am. Cash Advance Ctrs., Inc. v. FDIC*, 2017 U.S. Dist. LEXIS 27887, *21 (D.D.C. Feb. 23, 2017) (refusing to consider anonymous double hearsay). In any event, little of what Mr. Kelly apparently told Mr. Andrews has proven to be accurate.

**B. Factor 2: Trilliant has shown no irreparable harm.**

Trilliant bears the burden of proving that, absent an injunction, it will likely suffer irreparable injury. *See Winter v. NRDC, Inc.*, 555 U.S. 7, 22, 129 S. Ct. 365, 375, 172 L.Ed.2d 249, 262 (2008). A mere possibility of irreparable harm is insufficient. *See id.* "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). "In order to substantiate a claim that irreparable injury is likely to occur, a movant must provide some evidence that the harm has occurred in the past and

is likely to occur again." *Mich. Coal. of Radioactive Material Users, Inc.* v. Griepentrog, 945 F.2d 150, 154 (6th Cir. 1991).

Trilliant makes no showing of irreparable harm. Instead, it posits a *presumption* of irreparable harm. Such a presumption does not exist. For this proposition, Trilliant cites to an unreported case, which in turn mis-cited *Allied Erecting & Dismantling Co. v. Genesis Equipment & Manufacturing., Inc.*, 511 F. App'x 398, 405 (6th Cir. 2013). But, far from applying or recognizing a presumption of irreparable harm, the Sixth Circuit in *Allied Erecting* called it into question. *See id*. In *Allied Erecting*, the district court refused to grant a permanent injunction, finding that the jury award adequately compensated plaintiff for the misappropriation of its trade secrets. *See id*. at 404-05. On appeal, the plaintiff argued that irreparable harm was presumed. Affirming, the Sixth Circuit noted that the supposed presumption of irreparable harm, "rests on an assumption" that the harm will be difficult to measure. *See id*. at 405. The court found that "such a presumption is not applicable here." *Id*.

Other U.S. circuit courts of appeal have refused to recognize a presumption of irreparable harm in trade secret matters, either because the statutes permit but does not require injunctive relief, or because the presumption only makes sense when *dissemination* (as opposed to use by the defendant) of the trade secret is threatened. *See First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1143 (10th Cir. 2017) ("DTSA and [the Colorado Uniform Trade Secrets Act] ... merely authorize and do not mandate injunctive relief and thus do not allow a presumption of irreparable harm."); *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118-19 (2d Cir. 2009) ("A rebuttable presumption of irreparable harm *might* be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will *disseminate* those secrets

to a wider audience or otherwise irreparably impair the value of those secrets."
(emphasis added)). Although a recent decision, *Malamed* has already been followed by
at least one district court in the Sixth Circuit. *See JTH Tax, Inc. v. Freedom Tax, Inc.*,
No. 3:19-cv-00085, 2019 U.S. Dist. LEXIS 78532, at *36 (W.D. Ky. May 9, 2019) ("Thus,
when considering irreparable harm under the DTSA, courts generally analyze injunctive
requests according to traditional notions of what is required for such relief.").

Here, of course, there is no showing of dissemination of the "Trade Secret"
(whatever it may be) to a "wider audience." A explained above, Trilliant's theory that Mr.
McDonald gave Mr. Ruocco "software" has been debunked.

### C. Factor 3: The Defendants would need to cease operations if the requested injunction were issued.

It is difficult to assess this factor because "Trade Secret" is undefined, so
Defendants do not know what an issued injunction would look like. If, however,
Defendants were enjoined from using **any** algorithms for building episodes of care from
healthcare claims data, Defendants would have to cease operations. (*See* McDonald
Decl. ¶ 28.)

### D. Factor 4: An injunction would harm the public interest.

The public has an interest in vigorous competition, which encourages innovation.
*See Imax Corp. v. Cinema Technologies, Inc.*, 152 F.3d 1161, 1162 (9th Cir. 1998)
("Capitalism requires that both property rights and vigorous competition, each within
the limits fixed by law, coexist.") Further, restraints of trade are disfavored by law. *See
Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 471, 472 (Tenn. 1984); *Vantage Tech., LLC v.
Cross*, 17 S.W.3d 637, 644 (Tenn. Ct. App. 1999).

Here, if Defendants are enjoined from using **any** algorithms for building episodes of care from healthcare claims data, Defendants would have to cease operations. (*See* McDonald Decl. ¶ 28.) Such a restraint of trade would not benefit the public. (*See id.* ¶¶ 5-6.)

In addition, the work of healthcare data analysts directly benefits the public because of the light it sheds on the public's experience with the healthcare system. For example, Kythera Labs is currently poised to assist a professor at Johns Hopkins University with a major research study involving Alzheimer's disease and related dementias. To assist with the study, Kythera Labs will need to (among other things) build episodes of care. (*See id.* ¶ 31.)

## IV.    CONCLUSION

For the foregoing reasons, the Motion for Preliminary Injunction should be denied.

Respectfully submitted,

/s/ *Richard G. Sanders*
Richard G. Sanders (BPR No. 23875)
Aaron & Sanders, PLLC
605 Berry Rd., Ste. A
Nashville, TN 37204
rick@aaronsanderslaw.com
Tel.: (615) 734-1188
Fax (615) 250-9807

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION is being filed and will be furnished via CM/ECF, on this 16th day of March 2020, to:

Steven A. Riley
Alex Fardon
Riley Warnock & Jacobson, PLC
1906 West End Ave.
Nashville, TN 37203

Charles M. Cain, II
219 Third Avenue North
Franklin, Tennessee 37064

/s/ Richard G. Sanders
Counsel for Defendants